UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Gary M. and Garyonna M., minors, by and through their next friends, April Zealous and Gary McDaniel; and April Zealous, and Gary McDaniel,<br><br>   Plaintiffs,<br><br>  v.<br><br>City of North Charleston, Officer Bradley Woods, Captain Scott Perry, Sergeant Charity Prosser, Deputy Chief Coyle Kinard, Detective Karen MacDonald, Lieutenant Wade Humphries, Lieutenant Bowman, Sergeant Rob Kruger, Sergeant Skip Allen, MPO Winston Williams, PFC Clarence Habersham, PFC Christopher Gorman, PFC Charles Champion, PCC Justin Fogle, PFC Jeremy Stevens, and PFC Joshua Quick,<br><br>   Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No.: 2:16-cv-1087-DCN-MGB<br><br><br><br>**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE** |

_____

  Gary M. and Garyonna M., minors, by and through their next friends, April Zealous and

Gary McDaniel, and April Zealous[1] and Gary McDaniel (collectively, the "Plaintiffs"), filed this

action on January 21, 2015, in the Court of Common Pleas for Charleston County, South

Carolina. (Dkt. 1 at 1.) On March 22, 2016, Plaintiffs amended the complaint to set forth (1) a

cause of action against all of the defendants under 42 U.S.C. § 1983 for the alleged excessive or

unnecessary destruction of property in the course of a search as secured by the Fourth and

Fourteenth Amendments, and (2) a state law claim solely against the City of North Charleston

---

  [1]April Zealous is now known as April McDaniel; she married Gary McDaniel on December 13, 2014. (Dep. Zealous 4/5-10; 4/23-25.) In the instant Report and Recommendation, the court will refer to her as "Zealous."

("City") for Negligence and Gross Negligence.  (Dkt. 1-1.)  On April 7, 2016, Defendants removed this action to the United States District Court pursuant to the provisions of 28 U.S.C. §§ 1441(a) and (c), and filed an Answer on April 11, 2016.  (Dkt. Nos. 1, 4.)

On December 28, 2016, Defendants filed a Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56.  (Dkt. 25.)  In the motion, all Defendants seek summary judgment on Plaintiffs' § 1983 claim and on all claims made on behalf of the minor children.  Further, the individual Defendants seek summary judgment on the state law claims. Plaintiffs filed a response in opposition on January 10, 2017, and Defendants filed a reply on January 17, 2017.  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Civil Rule 73.02(B)(2)(d), D.S.C., to submit findings and recommendations to the District Court.  For the reasons stated below, this court recommends that the Defendants' Motion for Summary Judgment be granted in part, denied in part, and found to be moot in part.

## I.  FACTUAL BACKGROUND

On the evening of April 3, 2013, Defendant Officer Bradley Woods ("Defendant Woods") conducted a traffic stop of a vehicle.  (Dkt. 25-2 at 2-3.)  After being stopped, the driver proceeded to lead Woods on a chase that ended with the driver wrecking his car and fleeing on foot.  *Id.*  Defendant Sergeant Charity Prosser ("Defendant Prosser"), who was Defendant Woods' supervisor, went to the accident scene and realized that the suspect's car matched the description of a vehicle involved in a shooting earlier that evening.  (Dep. Prosser, 12/3-21; 20/1-5; 42/6-11, Ex. C.)  Vehicle information obtained regarding the suspect's car revealed that it

belonged to Jason Drayton ("the Suspect"). (*Id.*, 20/17-24; 26/2-5.) A K-9 unit tracked the Suspect to 1801 English Street, Apartment 5. (Dkt. 25-2 at 3.)

Defendant Prosser and another officer[2] knocked on the door of Apartment 5 and, after not getting a response, knocked on the door of Apartment 6. (Dep. Prosser, 29/24-25; 52/15 53/14.) Zealous and Gary McDaniel ("McDaniel") lived in Apartment 6 with their four children. (Dep. Zealous, 76/16-19.) Zealous advised Defendant Prosser and the other officer that the lady living in Apartment 5 was hard of hearing and that they would have to knock loudly. (*Id.*, 51/15-24; 52/15-24.) Defendant Prosser and the officer returned to Apartment 5 and talked with the occupant of Apartment 5, Lisa Heyward ("Heyward"), who advised them that the Suspect was not there. (*Id.,* 52/5-8.) At some point while talking to her, Defendant Prosser saw a footprint "[o]n the wall heading up to the attic" and at that point they "backed out" of Apartment 5. (*Id.*, 60/1-4, 60/11.) Although Heyward had given consent to search Apartment 5, a warrant was obtained prior to the search due to concerns about her hearing. (*Id.*, 57/17-20; Dep. Johnson, 30/6-16, Ex. J.)

### A.  The First Entry into Apartment 6

An officer went back to Plaintiffs' apartment and asked Zealous if their apartment (Apartment 6) shared a common attic space with Apartment 5; she said it did. (Dep. Zealous, 31/4-6, Ex. D.) Lieutenant Tammy Lynn Sad ("Sad") requested permission to search Plaintiffs' apartment for the Suspect. (Dep. Sad, 11/23 12/10; 14/6-13, Ex. F.)[3] Zealous discussed the

---

[2]This "officer" and the other "officers" referenced herein were not identified in the record.

[3]Zealous testified that the officer who asked to search the attic was a white male with a medium build and dark hair, wearing a North Charleston police uniform. (Dep. Zealous, 28/9-15; 30/8-1; 30/17 31/7.)

request with McDaniel and then gave permission to search the attic.  (Dep. Zealous, 31/6-11.)
Sad recalled that Zealous and McDaniel gave permission to search the apartment.  (Dep. Sad, 12/6-10; 146-13.)  Sad testified that a search was not conducted at that time, but was conducted later, after the SWAT team arrived.  (Dep. Sad, 12/17  13/5.)  Sad further testified that after Zealous and McDaniel gave their consent to search, she asked them to take the children and leave the apartment for their safety, and go downstairs to another apartment.  (Dep. Sad, 13/6-12; 14/6-19; 15/1-9.)  According to Sad, after Zealous, McDaniel, and the children left Apartment 6, SWAT arrived and conducted the search.  (Dep. Sad, 15/6-12.)

In contrast, Zealous testified that after she and McDaniel gave consent to search, three officers, with guns drawn, entered Plaintiffs' apartment.  (Dep. Zealous 31/12  32/5-6; 41/17  42/1.)  Zealous showed the officers the location of the attic.  (*Id.* 9/5-6.)  The three officers did not search the attic at this time but had their guns drawn, and stood below the attic area and called the Suspect's name and told him to come down.  (*Id.*, 9/6-9; 32/5-9; Dep. McDaniel, 30/3-9, Ex. G.)  About thirty minutes later, while the three officers were still in Plaintiffs' apartment with their guns drawn, another officer came to Plaintiffs' door and told them they would have to leave their apartment because the Suspect was armed and dangerous.  (Dep. Zealous 32/9-16.)  Zealous testified that McDaniel became upset and did not want to leave the apartment; an officer then threatened to arrest McDaniel "for not complying" if he did not leave.  (*Id.*, 32/18-22; 33/1-7.)  McDaniel did not want to leave their apartment and recalled that the officer threatened to arrest him for "not complying with a direct order or something like that[.]"  (Dep. McDaniel, 31/4-8; 46/5-13.)  Zealous testified that they decided to leave their apartment because the Suspect was armed and dangerous and because they had children in the house.  (Dep. Zealous,

32/22-25; 33/8-11.)  Zealous testified that they picked up the two younger children who were sleeping, and awoke the two older children; "[t]he officers were still in the hallway with their guns drawn.  So we bring our children to the hallway.  They see everything that's going on.  We left out of the house, went downstairs to our neighbor's."  (Dep. Zealous, 33/21-25; 43/4-10; 43/11-13; 44/18-25.)

McDaniel further testified that the officers knocked on the door of their apartment and asked if they shared an attic with Apartment 5, and then asked if they "can come in there and search, because the person in there [was] supposed to be armed and dangerous and had a shoot-out in West Ashley and believe he's in the attic with a gun."  (Dep. McDaniel, 26/21 4.) Zealous let the three officers in the apartment, and McDaniel showed them the access to the attic from the laundry room.  *(Id.* 28/7-13.)  McDaniel told the officers that they had children sleeping in the house.  (*Id.* 28/14-16.)  The officers in the laundry room shined a light in the attic, and called up to the Suspect, telling him to come down, but no one entered the attic until after the SWAT team arrived.  (*Id.* 30/2-9.)  Then, another officer knocked on the door and told the Plaintiffs they needed to leave the house.  (*Id.* 30/24-4.)  McDaniel "got the kids up and went downstairs to the neighbor."  (*Id.*, 31/11-13.)  McDaniel and Zealous each carried one of the smaller children, and each escorted one of the two older children; as they left, the officers were down the hall in the laundry room and the children could see them but did not have to walk past them.  (McDaniel, 32/17 13.)

**B.  The Second Entry into Apartment 6**

At approximately 2 A.M., Defendant Deputy Chief Coyle Kinard ("Defendant Kinard") requested that the Special Weapons and Tactics team ("SWAT") be called out.  (Dep. Perry,

11/10-20, Ex. H.)  Defendant Captain Scott Perry ("Defendant Perry") was the Commander of the SWAT team at that time and received a call from Dispatch that Defendant Kinard wanted the SWAT team to come to the English Street address.  (*Id.*, 6/19-22; 13/8-13.)  The SWAT team consisted of eleven officers: Defendants Lieutenant Wade Humphries ("Humphries"), Lieutenant Bowman ("Bowman"), Sergeant Rob Kruger("Kruger"), Sergeant Skip Allen ("Allen"), MPO Winston Williams ("Williams"), PFC Clarence Habersham ("Habersham"), PFC Christopher Gorman ("Gorman"), PFC Charles Champion  ("Champion"), PCC Justin Fogle ("Fogle"), PFC Jeremy Stevens ("Stevens"), and PFC Joshua Quick ("Quick").  (Dkt. 25-1 at 7; Dep. Perry, 12/9-19.)  Defendant Perry indicated that a protective sweep of Apartment 6 was conducted prior to entering the attic; a protective sweep is for the safety of officers and citizens, whereas a search is an exploratory investigation for evidence.  (Dep. Perry 49/6-9; 47/5-7.)  Defendant Perry testified that all eleven members of the SWAT team entered Apartments 5 and 6, some going into Apartment 5 and others into Apartment 6.  (*Id.*, 47/12-17.)  Defendant Perry stayed outside in the parking lot and did not go into either Apartment 5 or 6 during the time the SWAT team conducted the protective sweep and the search of the attic.  (*Id.*, 13/23-25, 14/1.)  Defendant Perry testified that the only members of the SWAT team that he knew had gone into Apartment 6 were Defendant Kruger and Defendant Habersham.  (*Id.,*  52/3-6.)  Defendant Perry testified that after learning that Plaintiffs' property had been damaged, he met with the SWAT team and asked who had gone into Apartment 6, and only Defendants Habersham and Kruger admitted entering Apartment 6.  (*Id.*, 52/3-18.)

McDaniel testified that he and his family were out of their apartment from a little after midnight until 5:00 or 5:30 A.M.  (Dep. McDaniel, 35/18-20.)  Plaintiffs allege that after the

search, when they were allowed to return to Apartment 6, they found that it had been "ransacked and a multitude of personal property items were unnecessarily destroyed and/or damaged." (Dkt. 1-1, ¶ 11.) Zealous described the condition of their apartment when they were allowed to return:

> Once we went into our house, the home was completely a wreck. It was not the way we left it. They searched in cabinets. They were searching under beds where you couldn't even   where a person couldn't even get under the bed. They destroyed my husband's nebulizer machine. They just completely just went in like they were searching for something else, besides looking for [the Suspect], and we were actually the victims and not, you know, the person they were looking for. So they went from the front to the  back of our house to the front. They went up in the attic, and they busted up and opened up the attic and everything in our home. Completely destroyed our things.

(Dep. Zealous, 35/6-19.)

Zealous testified that their laptops, a picture, their sofa, their television, their washer, their bed, and McDaniel's nebulizer[4] were broken. (Dep. Zealous, 47-48/21-25, 1-15.) McDaniel testified that, in addition to the items listed by Zealous, the legs had been broken off of their coffee table, the base to their swivel chair was broken, there was glass all over the floor, the frame of one of the beds was broken, and drawers in the house had been gone through and left open. (Dep. McDaniel, 39/19-20; 40/1-6; 41/5-19; 45/24  46/4.)

Sad and Defendant Kinard were still outside when Plaintiffs returned to their apartment. Sad heard Zealous and thought she sounded upset, so she and Defendant Kinard went to check on her. (Dep. Sad, 19/12-16.) Sad and Defendant Kinard testified that Plaintiffs were upset over the condition of Apartment 6 after the SWAT team had gone and that they had a right to be upset. (*Id.*, 24/2-7, 11-14; 21/23-24; Dep. Kinard, 7/16-23, Ex. I.) Sad testified that the Plaintiffs' apartment "looked a little disheveled" but the only broken item she saw was a picture frame.

---

[4]McDaniel testified that this was a CPAP machine. (Dep. McDaniel, 43/24-25.)

(Dep. Sad, 20/24  21/1-16.)  Sad and Defendant Kinard offered to help straighten things up but Zealous told them to leave.  (*Id.*, 21/1-16, 24/2-7, 11-4.)  Defendant Woods testified he was instructed by his supervisors, Sad and Defendant Kinard, to assist in cleaning up Plaintiffs' apartment, but that Zealous told them to leave.  (Dep. Woods, 79/19-24; 79/17-22, Ex. B.)

**C.  The Search Warrant for Apartment 6**

Defendant Kinard told Defendant Perry to have a search warrant prepared for Apartment 6.  (Dep. Kinard 23/8-20, *see also* 26/24  27/6.)  Defendant Kinard requested a search warrant for Apartment 6 because he was upset that the Plaintiffs' apartment had been "messed up" and wanted Plaintiffs to have some type of documentation that the officers had been in Apartment 6.  (*Id.* 18/2-11, 23/10-13, 27/23  28/6.)  Sad averred that she did not think it was necessary to get a warrant since they already had written documentation that the search had taken place and that Plaintiffs had given verbal consent for the search.  (Dep. Sad, 25/6-13.)

Pursuant to Defendant Kinard's directive, Defendant Perry directed Lieutenant Candy Johnson ("Johnson") to prepare a warrant.  (Dep. Perry, 21/1-2, 23/2-5.)  Johnson testified that she did not think it was necessary to acquire a warrant because Plaintiffs had consented to the search, and she addressed her concerns with Defendant Perry and Defendant Kinard.  (Dep. Johnson, 29/ 4-20, 30/19-23, Ex. J.)  Johnson prepared the affidavit for the search warrant for Apartment 6 because she was told to do so by her supervisor, Defendant Perry; in addition, she testified that Defendant Kinard "told me to get a warrant."  (*Id.*, 27/15-19, 29/8-9, 35/9-12.)

Johnson provided the information in the warrant, and Defendant McDonald signed the warrant and took it to Judge John L. Duffy, III ("Judge") for his signature.  (Dep. MacDonald, 28/19  29/2, Ex. K.)  Defendant MacDonald testified that she did not know that the search of

Apartment 6 had already occurred when she took the warrant to the Judge. (*Id.*, 21/7-12.)

Zealous was not present when an officer gave McDaniel a copy of the search warrant. (Dep.

Zealous, 37/17-19, 76/13-15.)

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall"

be granted "if the movant shows that there is no genuine dispute as to any material fact and that

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts are 'material'

when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence

would allow a reasonable jury to return a verdict for the nonmoving party." *The News &*

*Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An

issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might

return a verdict for the non-movant. *Anderson*, 477 U.S. at 257. In ruling on a motion for

summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable

inferences are to be drawn in that party's favor.'" *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541,

552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915

F.2d 121, 123  24 (4th Cir.1990).

The party seeking summary judgment assumes the initial burden of demonstrating to the

court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323,

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has made this threshold

demonstration, the non-moving party, to survive the motion for summary judgment, may not rest

on the allegations averred in his pleadings. *Id.* at 324. Instead, the non-moving party must

demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *See Anderson*, 477 U.S. at 252. Moreover, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *See Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## III. DISCUSSION

### A. 42 U.S.C. § 1983 Claims

Title 42 U.S.C. § 1983 provides a private cause of action for constitutional violations by persons acting under color of state law. Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). A legal action filed under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). In order to state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must allege (1) that he or she "has been deprived of a right, privilege or immunity secured by the Constitution or laws of the United States," and (2) "that the conduct complained of was committed by a person acting under color of state law.*" Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir. 1998) (citing 42 U.S.C. § 1983); *see also Gomez v. Toledo*, 446 U.S. 635, 540 (1983); *Hall v. Quillen*, 631 F.2d 1154, 1155-56 (4th Cir.

1980).  In a § 1983 action, "liability is personal, based upon each defendant's own constitutional violations."  *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

'Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression."  *United States v. Ramirez*, 523 U.S. 65, 71 (1998); *see also Hudson v. Michigan*, 547 U.S. 586, 602 (2006) ( affirming the holding in *Ramirez* that the destruction of property during the course of a lawful search may violate the Fourth Amendment).

At the outset, the undersigned has reviewed Plaintiffs' Amended Complaint and finds that Plaintiffs have not pled a cause of action for illegal search and seizure.  The only federal claim that Plaintiffs assert in the Amended Complaint is a § 1983 claim against all Defendants based on alleged constitutional violations of their right be free from excessive or unnecessary destruction of property in the course of a search as secured by the Fourth and Fourteenth Amendments.   (Dkt. 1-1 at 7-8.)  Plaintiffs cannot amend their complaint to add such a claim in their memorandum in opposition to summary judgment.  *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.") (citations and quotations omitted)

### 1.  Section 1983 Claim against the SWAT Team Defendants

The Defendants Perry, Humphries, Bowman, Kruger, Allen, Williams, Habersham, Gorman, Champion, Fogle, Stevens, and Quick, the members of the SWAT team ("SWAT Team) that was called on the night of April 3-4, 2013, argue that they are entitled to summary judgment because there is no evidence against them to create a genuine issue of fact as to whether they violated Plaintiffs' constitutional rights.

The only evidence in the record concerning the SWAT Team's activities that evening is from the deposition testimony of Defendant Perry, who was the Commander or Team Leader. (Dep. Perry, 12/23 13/3; Ex. H.) Defendant Perry testified that the SWAT Team was called to the apartment complex and he was told that there was a suspect barricaded in Apartment 5. (*Id.*, 9/25-25; 13/8-10.) Defendant Perry did not enter either Apartment 5 or 6 but remained outside in the parking lot when the other eleven members of the SWAT Team went into Apartment 5 and then into Apartment 6. (Perry, Dep., 6/18-22; 13/8 14/1; 14/4-6.) Defendant Perry further testified that not all eleven members of the SWAT team would have gone into Apartment 6 as some had to stay in the attic of Apartment 5. (*Id.*, 47/12-17.) After the SWAT Team had entered the apartments, Defendant Perry asked the SWAT Team, as a group, who had entered Apartment 6, and Defendants Kruger and Habersham acknowledged that they had been in Apartment 6. (*Id.*, 47/18-25.)

Defendants Perry, Humphries, Bowman, Allen, Williams, Gorman, Champion, Fogle, Stevens, and Quick contend that they are entitled to summary judgment as there is no genuine issue of fact as to whether they were in Apartment 6. The record does not contain any evidence that these ten individual SWAT team members ever entered Apartment 6. In order to have caused excessive or unnecessary damage, these ten Defendants would need to have entered Apartment 6. Therefore, viewing the evidence in the light most favorable to Plaintiffs, the record contains no evidence to create a genuine issue of fact that these ten Defendants caused unnecessary or unreasonable damage to Plaintiffs' property in violation of Plaintiffs' constitutional rights. Therefore, the undersigned recommends the court grant summary judgment

to Defendants Perry, Humphries, Bowman, Allen, Williams, Gorman, Champion, Fogel, Stevens, and Quick.

Defendants Kruger and Habersham are in a somewhat different position than the other members of the SWAT Team because the record places them inside Apartment 6. Defendants Kruger and Habersham argue that the mere fact that some damage was done does not rise to the level of a constitutional violation because any damage that occurred was not done unreasonably or intentionally.

The undersigned disagrees with Defendants Kruger and Habersham's contention that there is no evidence that they violated Plaintiffs' constitutional rights. The record reflects that Defendants Kruger and Habersham entered Apartment 6 during the protective sweep and search, and that some property damage occurred. The extent of the damage is disputed; Defendants admit that at least a picture was knocked off the wall. (Dep. Perry, 47/18-21.) Plaintiffs testified that a picture, a bed, a couch, a swivel chair, a CPAP machine, two laptop computers, a bed frame, a washing machine,[5] and a television also were damaged during the search, as well as the wooden frame surrounding the access point to the attic. (Dep. Zealous, 47/23  49/18; 55/7-10, 56/2-17Dep. McDaniel, 39/19-20; 40/1-6; 41/ 5-19.) The search requested was for the **attic** of Apartment 6, where officers believed the suspect to be hiding. The protective sweep was conducted through the rest of the house. Plaintiffs have provided evidence through their testimony that damage was done to areas where a person could not possibly be hiding. A reasonable juror might conclude that Defendants Habersham and Kruger were responsible for the

---

[5]The washing machine had been damaged when SWAT team members stood on top of it to gain access to the attic, which did not have any ladder access. (Dep. Zealous, 56/20  57/8.)

alleged damage, and that such destruction of property was unreasonable. Additionally, a comparison of the testimony of Officer Sad that the house was in "disarray" but that the only item she saw broken was a picture frame with the Plaintiffs' testimony of much more extensive damage creates a disputed issue of fact over the extent, or unreasonableness, of the property damage. Thus, viewing the evidence and drawing all reasonable inferences in the Plaintiffs' favor, the Plaintiffs have raised a genuine issue of fact as to whether the Defendants Kruger and Habersham acted reasonably while conducting the search that led to the alleged destruction of property.

### 2. Section 1983 Claim as to the Remaining Individual Defendants

#### a. Defendant Woods

Defendant Woods moves for summary judgment on Plaintiffs' Section 1983 claim. On April 3, 2013, Defendant Woods was a Patrolman First Class with the City of North Charleston Police Department. (Dep. Woods, 6/3-6; 10/10-12, Ex. G.) He initiated the traffic stop that ultimately led officers to Plaintiffs' apartment while in pursuit of the Suspect who had fled from the traffic stop. (*Id.*, 19/19-22; 22/13-15.) Defendant Woods testified that he went to the apartment complex after a K-9 unit had been called out to track the suspect. (*Id.*, 33/17-21.)

Defendant Woods testified that he stood outside on the perimeter of Apartment 6, and did not enter Apartment 6 until after the search had been completed. (*Id.* at 46/9-14, 78/14-24.). This is the only evidence in the record concerning Defendant Woods' entry into Apartment 6. Because his entry into Apartment 6 occurred **after** the search was conducted, he argues he could not have damaged Plaintiffs' property and therefore is entitled to summary judgment on Plaintiffs' § 1983 claim for excessive and unnecessary destruction of property.

### b. Defendant Prosser

Defendant Prosser also moves for summary judgment on Plaintiffs' federal claim. The record reflects that Defendant Prosser was Defendant Woods' supervisor on April 3, 2013. (Dep. Prosser, 12/6-21.) Defendant Prosser testified that she went to the apartment complex on the evening of April 3-4, 2013, and spoke with the occupants of Apartments 5 and 6. (*Id.*, 52/15-25.) The record also reflects that Defendant Prosser assisted in obtaining a warrant for Apartment 5. (*Id.,* 19/16-18.) Defendant Prosser testified that the officers had obtained consent to search Apartment 6 and that she was present when Plaintiffs gave their consent. (*Id.*, 51/3-8.)

Defendant Prosser argues that there is no evidence that she participated in the protective sweep or the search and she had no involvement with damaging Plaintiffs' property or obtaining the search warrant for Apartment 6; therefore, she is entitled to summary judgment on Plaintiffs'§ 1983 claim.

### c. Defendant MacDonald

Defendant MacDonald also moves for summary judgment on Plaintiffs' § 1983 claim. Defendant MacDonald argues that she was not a member of the SWAT team and did not participate in the protective sweep or search. She further argues that there is no evidence that she damaged Plaintiffs' property.

Defendant MacDonald was the officer from the North Charleston Police Department who took the warrants for Apartments 5 and 6 to a Judge for signature pursuant to the direction of her supervising officers. (Dep. MacDonald, 21/ 7-12.) Defendant MacDonald also testified that she did not go into the apartment building where Apartment 6 was located. (*Id.*, 9/10/21-

25;10/1.)  There is no other evidence in the record that connects Defendant MacDonald to Apartment 6.

d.  Defendant Kinard

Defendant Kinard also moves for summary judgment on Plaintiffs' § 1983 claim. Defendant Kinard was the Deputy Chief who requested the SWAT team come to the apartment complex.  He argues he was not a member of the SWAT team and did not participate in the protective sweep and search.  He further argues that he is entitled to summary judgment because there is no evidence that he was involved in damaging Plaintiffs' property.

The record reflects that Defendant Kinard arrived at the apartment complex after the SWAT team had completed its search and was exiting Apartment 6.  (Dep. Kinard, 44/14-20.) The record further reflects that Defendant Kinard briefly entered Apartment 6 with Sad, after the search was completed, to try and help straighten things up.  (*Id.*, 35/15-16.)  However, there is no evidence that Defendant Kinard was inside Apartment 6 during the search or that he caused excessive or unnecessary damage to Plaintiffs' property, thus violating Plaintiffs' constitutional rights.

e.  Analysis

With respect to the Motion for Summary Judgment by individual Defendants Woods, Prosser, Kinard, and MacDonald, Plaintiffs have failed to set forth evidence to refute these Defendants' claims that there is no evidence that (1) any of them entered Apartment 6 while the search was being conducted, and (2) no evidence that any of them could have possibly caused the property damage.  Defendants Woods, Prosser, Kinard, and MacDonald were not involved in the protective sweep and search of Apartment 6 by members of the SWAT team.  Viewing the

evidence in the light most favorable to Plaintiffs, they have failed to demonstrate that specific material facts exist that give rise to a genuine issue as to whether or not these Defendants caused excessive or unnecessary damage to Plaintiffs' property so as to violate Plaintiffs' constitutional rights. As such, the undersigned recommends granting summary judgment to Defendants Woods, Prosser. Kinard, and MacDonald.

### 3. Qualified Immunity

The Defendants assert that they are immune from suit under the doctrine of qualified immunity. (Dkt. 25-1 at 14-18.) "Qualified immunity shields government officials from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity protects officers from liability for "bad guesses in gray areas" and bases liability on the violation of bright-line rules. *Id.* (quoting *Braun v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011)). To determine whether a defendant is entitled to qualified immunity, the court must examine whether the defendant violated the plaintiff's constitutional or statutory rights and, if so, whether the defendant's "conduct was objectively reasonable in view of the clearly established law at the time of the alleged event." *Id.*

As to Defendants Perry, Humphries, Bowman, Allen, Williams, Gorman, Champion, Fogle, Stevens, Quick, Woods, Prosser, McDonald, and Kinard, the undersigned has concluded that no genuine issue of material fact exists as to whether they violated the Plaintiffs' constitutional or statutory rights and that these defendants are entitled to summary judgment on

the section 1983 claims. Because these Defendants did not violate the Plaintiffs' constitutional or statutory rights, they are entitled to qualified immunity as well.

As to Defendants Kruger and Habersham, this court has already concluded that a genuine issue of material fact exists as to whether they violated the Plaintiffs' constitutional rights. The court must now address if Defendants Kruger and Habersham's actions were objectively reasonable in view of the clearly established law at the time of the incident. The court "must first identify the specific right that the plaintiff asserts was infringed by the challenged conduct at a high level of particularity." *Edwards v. City of Goldsboro*, 178 F.3d 231, 250-51 (4th Cir. 1999) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Taylor v. Waters*, 81 F.3d 429, 433 (4th Cir.1996)). To be clearly established, "the contours of the right must have been so conclusively drawn as to leave no doubt that the challenged action was unconstitutional." *Edwards*, 178 F.3d at 251 (quoting *Swanson v. Powers*, 937 F.2d 965, 969 (4th Cir.1991) (internal quotations omitted)). "In determining whether a right was clearly established at the time of the claimed violation, 'courts in this circuit [ordinarily] need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose....'" *Edwards*, 178 F.3d at 251 (quoting *Jean v. Collins*, 155 F.3d 701, 709 (4th Cir.1998) (*en banc*)) (alteration in *Edwards*). "'[I]f a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense.'" *Edwards*, 178 F.3d at 251 (quoting *Jean v. Collins*, 155 F.3d 701, 708 (4th Cir.1998) (*en banc* )) (alteration in *Edwards*).

The right in the case at bar was the Plaintiffs' right to be free from an unreasonably destructive search under the Fourth Amendment. As discussed *supra*, the Supreme Court held in *Ramirez* that "[e]xcessive or unnecessary destruction of property in the course of a search may

violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." 523 U.S .at 71. The Plaintiffs' right to be free from an unreasonably destructive search under the Fourth Amendment was clearly established by the Supreme Court in *Ramirez. Hudson v. Michigan*, 547 U.S. 586, 602 (2006); *see also Cybernet, LLC v. David*, No. 7:16cv-16-RJ, 2016 WL 5106986, at *8 (E.D.N.C. Sept. 19, 2016) (holding that Plaintiff's right to be free from an unreasonably destructive search was a clearly established right under *Ramirez*); *Wood v. Se. Penn. Transp. Auth.*, No. 14-cv-4183, 2016 WL 2619411, at *7 (E.D. Pa. May 6, 2016) ("The right to be free from an unreasonably destructive search was clearly established by Supreme Court precedent [*Ramirez*]."). This court concludes that the Plaintiffs' right to be free from an unreasonably destructive search under the Fourth Amendment was clearly established at the time of the search in this case. Therefore, Defendants Kruger and Habersham are not entitled to qualified immunity because a genuine issue of material fact exists as to whether Defendants Kruger and Habersham violated the Plaintiffs' clearly established Fourth Amendment rights.

### 4. 42 U.S.C. § 1983 Claims Against the Defendant City of North Charleston[6]

Plaintiffs also claim that their constitutional rights were violated by the City. Municipalities, such as cities, are "persons" amenable to suit under § 1983. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). However, municipalities only are liable under § 1983 when a plaintiff proves a *Monell* claim. *See Monell*, 436 U.S. at 691. To prove a *Monell* claim

---

[6]The undersigned notes that all Defendants have moved for summary judgment regarding Plaintiffs' federal cause of action, but the City did not present an argument in support of its motion for summary judgment. Out of an abundance of caution, the undersigned has addressed the City's liability.

against the City, the Plaintiffs must show that "the constitutionally offensive acts of city employees [were] taken in furtherance of some municipal 'policy or custom.'" *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (citing *Monell*, 436 U.S. at 694). The Fourth Circuit has held there are four ways that a city may be found liable through official policy or custom. *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (citing *Monell*, 436 U.S. at 690-91)). "Municipal policy may be found in written ordinances and regulations, . . . in certain affirmative decisions of individual policymaking officials, … or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens." *Carter*, 164 F.3d at 218. A municipal custom may be established "[o]utside of such formal decision making channels . . . if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a custom or usage' with the force of law.'" *Id.* (quoting *Monell*, 436 U.S. at 691).

There is no governmental liability under § 1983 based upon the doctrine of *respondeat superior*, and a governmental entity may not be held liable under § 1983 under a theory of vicarious liability simply because it employs a tortfeasor. *Monell*, 436 U.S. at 691-692. Thus, a city may only be liable for damages when the execution of the town's policy or custom results in an alleged injury. *Id.* at 694; *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987). For municipal liability to attach, the policies or customs must have a "specific deficiency or deficiencies . . . such as to make the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run." *Carter*, 164 F.3d at 218 (quoting *Spell*, 824 F.2d at 1390) (emphasis added by *Carter* court)).

Plaintiffs have failed to plead and develop sufficient facts to establish that the City is liable for the specific violations alleged  the excessive or unnecessary destruction of property in the course of a search  and that the risk of these violations was the direct result of an official policy or custom.  Here, Plaintiffs have failed to show any evidence sufficient to create a genuine issue of material fact as to whether the actions of the Individual Defendants in this case were the result of the City's custom or policy.  Moreover, even if the evidence otherwise showed that the Individual Defendants in this case violated Plaintiffs' constitutional rights, their actions cannot be imputed to the City, because there is no evidence of any official policy or custom of the City that would have resulted in the allegedly improper actions taken by the police officers.  The sole reference to the City in the Amended Complaint is set forth in the following general allegation:

> [t]he City of North Charleston Police Department has organization values. Some of which are to protect the life and property of its citizens, to adhere to the highest ethical standards of personal and professional conduct, and to respect the rights of all citizens.

(Dkt. 1-1, ¶ 10.)

In a conclusory paragraph, Plaintiffs assert:

> [d]uring the course of a second search of Plaintiffs' home conducted by the City of North Charleston Police Department and the Officers, the Plaintiff's [sic] home was ransacked and a multitude of personal property items were  unnecessarily destroyed and/or damaged.  Moreover, the entire family was traumatized and terrorized by the conduct of the Defendants, all of which was in violation of organizational values, policies, procedures and the Fourth and Fourteenth Amendments of the U.S. Constitution.

(*Id.*, ¶ 11.)  These allegations fail to set forth a specific City policy that refers to the conduct alleged in this case, or which would serve to create a genuine issue of fact as to whether or not the City condoned, through a policy or custom, the excessive or unnecessary destruction of property by police officers in carrying out a search under the circumstances set forth in this case.

21

As Plaintiffs have not set forth any facts to establish the necessary connection between a policy or custom of the City and the violation of Plaintiffs' constitutional rights, this court recommends that Plaintiffs' § 1983 against the City be dismissed.

## B. State Law Claims

The Defendants move for summary judgment as to all state law claims against "all individually names officers"--i.e., all Defendants other than the City. (Dkt. 25-1 at 10.) The Defendants correctly argue that the South Carolina Tort Claims Act, § 15-78-10 *et seq.* bars any action against the individual Defendants in this case. (*Id.*) The Tort Claims Act states:

> [A] person, when bringing an action against a governmental entity under the provisions of this chapter, shall name as a party defendant only the agency or political subdivision for which the employee was acting and is not required to name the employee individually, unless the agency or political subdivision for which the employee was acting cannot be determined at the time the action is instituted. In the event that the employee is individually named, the agency or political subdivision for which the employee was acting must be substituted as the party defendant.

S.C. Code Ann. § 15-78-70(c); *see also Proveaux v. Med. Univ. of S. Carolina*, 326 S.C. 28, 30, 482 S.E.2d 774, 775 (1997).

However, the Amended Complaint only asserts state law claims against the City, which is proper party under section 15-75-70(c). (Dkt. 1-1 at 4-5.) Therefore, the Defendants' Motion is denied because therere are no state law claims against the individually named Defendants.

## C. Claims Brought by Minor Children

The Defendants move for summary judgment as to all claims brought by Gary M. and Garyonna M., minors, by and through their next friends, Zealous and Gary McDaniel. (Dkt. 25-1 at 18-19.) The Defendants argue that the Amended Complaint does not sufficiently state a claim

on behalf of the minor Plaintiffs, that the minor Plaintiffs were not present at the time of the search, and that the minor Plaintiffs had no property interest in the destroyed items. (*Id.*)

The Fourth Amendment protects individuals from "unreasonable searches and seizures by government officials and those private individuals acting as 'instrument[s] or agent[s]' of the Government." United States v. Jarrett, 338 F.3d 339, 344 (4th Cir.2003 ) (quoting U.S. Const. amend. IV). The Fourth Amendment has been held to protect a child's rights in the home as an adult's rights. *Roe v. Texas Dep't of Protective & Regulatory Servs.*, 299 F.3d 395, 411 (5th Cir. 2002) ("The Fourth Amendment fully embraces a parent or child's claim that a social worker has unlawfully entered the home...."). This court finds that the record is not clear as to whether any of the property destroyed during the search belonged to the minor Plaintiffs. Zealous testified that the home was completely destroyed and damage was throughout the home. (Dep. Zealous, 35/6-19.) Both Zealous and McDaniel testified that the children saw the officers in the house. Additionally, the claim brought under the South Carolina Tort Claims Act is brought by all of the Plaintiffs and includes claims for negligent training and supervision. (Dkt. 1-1.) The Defendants have not cited to any law supporting their position that the children could not bring such claims. Therefore, as to the Defendants' Motion in regards to the claims brought by the minor Plaintiffs, this court recommends denying the motion.

## IV. CONCLUSION

Based on the foregoing, this court recommends that the Defendant's Motion for Partial Summary Judgement (Dkt. 26) be **GRANTED** as to Defendants Perry, Humphries, Bowman, Allen, Williams, Gorman, Champion, Fogle, Stevens, Quick, Woods, Prosser, McDonald, Kinard, and the City of North Charleston. The court further recommends that the Motion be

**DENIED** as to Defendants Kruger and Humphries.   The court further recommends that the

Motion be found to be **DENIED** as to the state  law claims brought against the individual

Defendants as no such claims are alleged.

      **IT IS SO RECOMMENDED.**


August 3, 2017

Charleston, South Carolina

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE


      **The parties are directed to note the important information in the attached
Notice of Right to file Objections to Report and Recommendation.**

**Notice of Right to File Objections to Report and Recommendation**

      The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

      Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk

United States District Court

Post Office Box 2317

Florence, South Carolina 29503

      **Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).